**IN THE UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF FLORIDA**
**PENSACOLA DIVISION**

**STEPHEN LILLO, as Personal Representative of**
**THE ESTATE OF JOHN R. LILLO, JR.,**

        **Plaintiff,**

**v.**                              **Case No. 3:06cv247/MCR/EMT**

**DARRELL A. BRUHN, et al.,**

        **Defendants.**

_____/

# O R D E R

      Stephen Lillo ("Plaintiff"), in his capacity as personal representative of the estate of John R. Lillo Jr. ("Lillo"), sues Richard S. Brown, William P. Broxson, Darrell A. Bruhn, Howard R. Harran, Matthew M. Holt, Tom Matz, Robert D. Millard, Edmund K. Rossi and Donne G. Yeakos, officers with the Fort Walton Beach, Florida Police Department, under federal law for violation of Lillo's civil rights.[1]  Specifically, plaintiff's complaint raises the following five claims, all under 42 U.S.C. § 1983: cruel and unusual punishment (Count I), excessive force (Count II), unlawful seizure (Count III), failure to intervene (Count IV) and deliberate indifference to a serious medical need (Count V).  Pending are motions for summary judgment filed by these nine officers on qualified immunity grounds.  For the reasons explained, the court GRANTS all motions.

_____

[1]  The complaint also raises claims against two Fort Walton Beach firefighters, Robert Bullard ("Bullard") and Charles George ("George").  These defendants, however, failed to timely file motions for summary judgment, and the court denied their motion for leave to file motions for summary judgment after the court's deadline (docs. 201, 203).

**Background**

This case centers on events which began on January 21, 2004, and continued into the early morning of January 22, 2004, in Fort Walton Beach.  On the afternoon of January 21, 2004, while on patrol, Officer Matthew Holt observed a man, who he knew as John Lillo, wandering in traffic.  Another police officer at the scene with Holt spoke to Lillo to check on him, but otherwise did not detain him.  A few hours later, Holt heard radio communication indicating that Lillo was again wandering into traffic, but he did not respond to the radio call.[2]  At approximately 11:40 pm the same day, while still on patrol, Holt saw Lillo again, but this time Lillo was nude from the waist down and defecating within the view of others outside a boarding house.  At this time, Holt intended to arrest Lillo for disorderly conduct[3] and called for assistance because he knew Lillo had attacked police officers in the past.[4]  Brown, Broxson, Bruhn, Harran, Millard and Yeakos responded.[5]  Brown testified that when he arrived Lillo was agitated and breathing heavily, and his face was flushed, as though he was angry.  Brown was aware that Lillo had been previously involuntarily committed under Florida's Baker Act.[6]  When Holt told the officers that Lillo had committed a crime, Harran and Millard handcuffed Lillo and placed him in the back of Harran's cruiser.  However, rather than arrest Lillo for disorderly conduct, Brown, Bruhn

---

[2]  It is unclear from the record whether any other officer responded.

[3]  *See* Fla. Stat. ch. 877.03 (prohibiting acts which "corrupt the public morals, or outrage the sense of public decency, or affect the peace and quiet of persons who may witness them . . . [or] constitute a breach of the peace or disorderly conduct.")

[4]  On December 7, 2003, Lillo's landlord called the Fort Walton Beach police department for assistance after unsuccessfully attempting to evict Lillo.  When the police attempted to convince Lillo to leave the premises, he became irrational and enraged.  In the ensuing struggle, Lillo inflicted minor injuries on three Fort Walton Beach police officers, including Harran, before they took him into custody for an involuntary psychiatric examination.  Lillo was a large man, approximately six feet tall and over two hundred and sixty-five pounds.

[5]  Although Matz is named as a defendant in the unlawful seizure claim, plaintiff does not allege that Matz was present when officers took Lillo into custody.

[6]  Florida's Baker Act provides for the involuntary commitment of mentally ill individuals who pose a threat to themselves or others.  *See* Fla. Stat. ch. 394.463 (describing involuntary commitment criteria and procedures).

Case No: 3:06cv247/MCR/EMT

and Holt collectively decided to transport Lillo for an involuntary examination under the Baker Act, based on Lillo's known psychiatric condition, his apparent lack of awareness of his surroundings, and their fear Lillo might be a danger to himself.[7]

Harran, accompanied by Holt and Millard, transported Lillo to Bridgeway without incident.[8] While Harran waited with Lillo in Harran's vehicle, Holt and Millard entered Bridgeway to speak with the staff. From the beginning, Bridgeway staff was reluctant to admit Lillo.[9] Nonetheless, at 12:10 a.m., January 22, 2004, Bridgeway staff assessed Lillo in the back of Harran's vehicle. According to Bridgeway records, at that time, Lillo was alert and oriented, but angry, and shouted that he did not want to be at Bridgeway. At approximately 12:20 a.m., Lillo shattered the rear window of Harran's vehicle.[10] As a result, Harran and Holt radioed for officer assistance, and Broxson, Bruhn, Brown, Matz, Rossi and Yeakos responded to Bridgeway. The officers convinced Lillo to leave the vehicle and restrained him with leg restraints without resistance.[11]

At approximately 12:30 am, Brown, Harran and Millard escorted Lillo, in restraints, into Bridgeway's lobby and placed him in a chair. Harran testified that Bridgeway staff told

---

[7] Brown asked Lillo whether he had taken his psychiatric medication, and Lillo said he had run out. Brown asked Lillo whether he wanted to go with the officers to Bridgeway Crisis Stabilization Unit ("Bridgeway") to get more medication, and Lillo said he did. Although Lillo voluntarily accompanied the officers to Bridgeway, the examination was involuntary because the officers decided that Lillo was unable to determine for himself whether a psychiatric examination was necessary. *See* Fla. Stat. ch. 394.463(1).

[8] Bridgeway was the nearest intake facility for Baker Act patients.

[9] The officers testified that Mr. Zubon, a Bridgeway nurse, requested several times that the officers arrest Lillo, and then requested that the officers take Lillo to a hospital to be screened for drug use. This apparently was based on Nurse Zubon's knowledge that, during a previous stay at Bridgeway, Lillo attempted to strangle a female patient. Nurse Zubon's first name does not appear in the record.

[10] The record is unclear as to exactly how this incident occurred. Brown testified that Harran told him Lillo broke the window with his head. Harran testified that he heard Lillo break the window but was not sure how Lillo broke it. Holt and Millard both testified that they witnessed Lillo roll to the side and kick the window several times until it shattered.

[11] Bruhn instructed Rossi to enter Bridgeway and speak with Bridgeway staff about Lillo, and made the decision to shackle Lillo's legs. Brown calmed Lillo down so Millard could apply the restraints to him. Broxson and Yeakos did not interact with Lillo or Bridgeway staff at this point, but were at the scene in order to assist if it became necessary.

him that Lillo could not be admitted without a medical clearance. Notwithstanding the Bridgeway staff's refusal to admit Lillo, a staff member paged a physician,[12] who prescribed Ativan and Geodon, as needed, to control Lillo's violent behavior.[13] Broxson testified that Lillo tried to get up and walk out of Bridgeway, and that officers sat him back down in the chair. At that point, according to Bridgeway records and the testimony of the police officers, Lillo became agitated and struggled with police.[14] Brown, Harran and other officers pulled Lillo to the floor by his waist and shoulders.[15] Brown, Harran, Millard and Yeakos restrained Lillo on the ground by applying pressure with their hands to his shoulders and extremities. In doing so, Brown noticed Lillo had twisted and bent his handcuffs during the struggle. Concerned Lillo might injure them or himself, the officers placed additional sets of handcuffs on Lillo's wrists and connected the handcuffs to Lillo's leg restraints with a nylon rope.[16] The officers then placed Lillo on his side so that he could breathe. According to the officers, despite the additional restraints, Lillo alternated between struggling and periods of relative calm. At 12:40 a.m., Bridgeway staff observed and recorded that Lillo was restrained with his face down and to the side. Also, according to the records, at that time Lillo's breathing was heavy, but he was not in respiratory distress; he had an open airway; his color was pink; and his skin was warm and dry. At

---

[12] The record suggests, but does not explicitly state, that the physician paged was not on site. Nothing in the record shows any physician interacting with Lillo in person while he was at Bridgeway.

[13] Bridgeway records for the time immediately prior to the request for a prescription for Lillo describe him as being in a violent mood, and breaking out the car window in a violent rage.

[14] Bridgeway records state that Lillo struggled with police officers. The officers testified that Lillo screamed, flailed, and strained against his restraints. The testimony of the officers contains a slight inconsistency regarding the exact sequence of events, however. Brown testified that Lillo became agitated upon entry to the lobby, while Harran and Broxson testified that Lillo became agitated after sitting down. This distinction is meaningless for purposes of this order.

[15] Millard testified that Lillo went to the floor willingly. However, Brown testified that he, Harran, and at least one other officer pulled Lillo down. Broxson also testified that other officers took Lillo down. Bridgeway records reflect the officers restrained Lillo on the floor after he struggled with them.

[16] Connecting the hand and feet together behind the back in this manner is called fettering, or "hogtying." *See Lewis v. City of West Palm Beach, Fla.*, 561 F.3d 1288, 1290 (11th Cir. 2009).

approximately 12:45 a.m., a Bridgeway nurse administered Ativan and Geodon to Lillo and informed the officers that the medications would take up to twenty minutes to take effect.[17] Bruhn departed Bridgeway once the medications were administered.

At approximately 12:50 a.m., Bridgeway staff cleaned facial injuries Lillo received during his struggles, including small lacerations, a hematoma over his left eye, and slight bruising. At approximately 1:00 a.m., Bridgeway staff called EMS to treat Lillo's facial lacerations and transport him to a hospital for medical clearance. According to Bridgeway records, at this time Lillo continued to struggle.

At approximately 1:10 a.m., Fort Walton Beach Fire Department employees Robert Bullard, the battalion chief and a paramedic, Charles George, an EMT, and Christopher Purvis ("Purvis"), also an EMT, arrived at Bridgeway.[18] Purvis testified Lillo was standing when he arrived, and was disruptive and violent and had to be taken down to the floor. Bullard and George testified that, when they arrived, Lillo was on the floor, thrashing around and struggling against his restraints. Bullard and George also testified Lillo struck his own head against the floor repeatedly; as a result and in an effort to prevent Lillo from injuring himself, Bullard used his hands and knees to keep Lillo's head still.[19]

At approximately 1:15 a.m., Okaloosa County EMS employees Wally Ebbert ("Ebbert"), a paramedic, and Thearon Shipman ("Shipman"), an EMT, arrived at Bridgeway. Bullard turned over Lillo's care to Ebbert; however, Bullard, George and Purvis continued to assist Ebbert as needed. Ebbert called a physician, Dr. Comer, who authorized Ebbert

---

[17] According to plaintiff's's statement of material facts, the officers restrained Lillo on the floor of Bridgeway for nearly two hours before Bridgeway called a physician. (*See* doc. 195 at 8). As noted, however, the Bridgeway records reflect that staff paged a physician and requested authorization to administer psychiatric medication to Lillo contemporaneously with Lillo's arrival at Bridgeway. Also, as noted, authorization was received and the medication was administered to Lillo approximately fifteen minutes later.

[18] At approximately 1:05 a.m., Lillo's facial injuries stopped bleeding.

[19] Bullard testified he and George held Lillo's head still. George testified Bullard was closest to Lillo's head, while George held down Lillo's ankles. Wally Ebbert, an Okaloosa County paramedic, testified that when he arrived Bullard was at Lillo's head, with Bullard's hands and knees touching Lillo. The Okaloosa EMS run report indicates that a Fort Walton Beach Fire Department paramedic was at Lillo's head, holding it to the ground with his hands and knees, while police officers held Lillo's legs down.

to administer Haldol, an anti-psychotic medication, to Lillo intravenously, which he did at 1:30 a.m.[20] Ebbert testified that after he administered Haldol to Lillo, Lillo continued to struggle, then suddenly stopped breathing; no pulse was detected at approximately 1:30 a.m. Officers immediately removed Lillo's restraints, and Ebbert performed cardiopulmonary resuscitation, which restored Lillo's pulse. At approximately 1:45 a.m., EMS transported Lillo to Fort Walton Beach Medical Center, arriving ten minutes later. Lillo was pronounced dead at 2:19 a.m.

The medical examiner, Dr. Andrea Minyard, reported Lillo's cause of death as complications of acute psychosis. Her report noted multiple abrasions, lacerations and contusions of the face, scalp and extremities, as well as deep contusions of the skin and muscle of the posterior neck. Plaintiff's expert, Dr. Michael Berkland, testified that Lillo's autopsy photographs depicted "extensive deep subcutaneous hemorrhage that extends down and involves the musculature of the cervical and upper thoracic spine." Based on the injuries to Lillo's neck, and the reports of Bullard restraining Lillo's head with his hands and knees, Berkland concluded that Lillo's death was the result of asphyxia induced by compression and restraint of the neck and upper back.

**Discussion**

The officers move for summary judgment on qualified immunity grounds. A motion for summary judgment should be granted if there is no genuine issue of material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); *Welding Servs., Inc. v. Forman*, 509 F.3d 1351, 1356 (11th Cir. 2007). The court must avoid weighing contradictory evidence or making credibility determinations, *Stewart v. Booker T. Washington Ins.*, 232 F.3d 844, 848 (11th Cir. 2000), and must draw all reasonable inferences in the nonmoving party's favor. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). The court, however, cannot ignore uncontradicted

---

[20] Dr. Comer was a physician at Fort Walton Beach Medical Center; he was not present at Bridgeway. Ebbert testified he notified Dr. Comer that Lillo had previously been given Geodon and Ativan. Dr. Comer's first name is not in the record.

evidence simply because it is unfavorable to the nonmoving party. *See Fennell v. Gilstrap*, 559 F.3d 1212, 1215 n.3 (11th Cir. 2009).

Qualified immunity protects municipal officers from liability under § 1983, provided their actions were within the scope of their discretionary authority and did not violate clearly established constitutional rights of which a reasonable person would have known. *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)*; see also Lewis*, 561 F.3d at 1291. An officer acts within the scope of his discretionary authority when the officer performs a legitimate job-related function through means within the officer's power to utilize. *Holloman ex rel. Holloman v. Harland*, 370 F.3d 1252, 1265-66 (11th Cir. 2004). In deciding this question, the court looks to the general nature of the officer's actions, not to his specific conduct. *Id.* at 1266. If the officer was engaged in a discretionary duty, the burden shifts to the plaintiff to demonstrate the officer is not entitled to qualified immunity. *See Mercado v. City of Orlando*, 407 F.3d 1152, 1156 (11th Cir. 2005). To do so, the plaintiff must establish that the officer's conduct violated a constitutional right and that the right was clearly established at the time of the alleged violation. *Id.* The court may decide either of these two prongs first. *See Pearson v. Callahan*, 129 S. Ct. 808, 818 (2009). In the event the court determines that no constitutional right was violated, it need not analyze whether the right was clearly established. *See Case v. Eslinger*, 555 F.3d 1317, 1328 (11th Cir. 2009).

<u>Discretionary Authority</u>

Plaintiff argues the officers were not acting within the scope of their discretionary authority because they seized Lillo in violation of Florida's Baker Act.[21] However, as noted, the scope of discretionary authority does not turn on whether the specific act was unlawful, but instead focuses on the general nature of the act. *See Holloman*, 370 F.3d at 1266. In this case, when the officers took Lillo in custody, they were performing the job-related function of protecting the public, through statutorily authorized means.[22] Thus, the officers

---

[21] *See* Fla. Stat. ch. 394.463(1) (permitting the involuntary examination of apparently mentally-ill persons who pose a threat of harm to themselves or others).

[22] Fla. Stat. ch. 394.463(2)(a)(2) ("A law enforcement officer *shall* take a person who appears to meet the criteria for involuntary examination into custody.") (emphasis added).

acted within the scope of their discretionary authority, and are entitled to qualified immunity unless the officers violated Lillo's clearly established constitutional rights. *See Mercado*, 407 F.3d at 1156.

Unlawful Seizure

Plaintiff claims the officers unlawfully seized Lillo by taking him into custody for an involuntary examination because at the time he was non-violent, non-threatening, unarmed, not suicidal, and "simply voiding out of doors in a field."[23] (Doc. 186 at 9). In Florida, the Baker Act provides the standards for an involuntary examination. *See* Fla. Stat. ch. 394.463(1). Under Florida's Baker Act, a person may be taken into custody for an involuntary examination when a police officer has reason to believe (1) the person has a mental illness; (2) the person has refused voluntary examination or is unable to determine for him or herself whether examination is necessary; and (3) without care or treatment, the person is likely to suffer from neglect, which poses a real and present threat of substantial harm to himself or herself or there is a substantial likelihood that the person will cause serious bodily harm to him or herself or others in the near future. *See id.* Although the Baker Act establishes the substantive, state law standard for involuntary commitment, it has no effect on the Fourth Amendment. Indeed, it is irrelevant for Fourth Amendment purposes whether a seizure or an arrest violated state law, as long as it was supported by probable cause. *Virginia v. Moore*, 128 S. Ct. 1598, 1604 (2008); *see also United States v. Goings*, slip. op. 2937, 2938 (11th Cir. July 7, 2009) (per curiam); *Cochrane v. Harvey*, 2005 WL 2176874, at *3 (N.D. Fla. Sept. 1, 2005) (Seizure of a person for involuntary psychiatric examination must be supported by probable cause to believe that the person meets criteria for such examination under state law.). Furthermore, for qualified immunity, an officer need only have arguable probable cause, not actual probable cause. *See Garczynski v. Bradshaw*, 573 F.3d 1158, 1167 (11th Cir. 2009); *Montoute v. Carr*, 114 F.3d 181, 184 (11th Cir. 1997). In other words, the facts and

---

[23] Plaintiff names all officers except Rossi as defendants in this count.

circumstances must be such that a reasonable officer could believe that probable cause existed.  *Id.*

    In this case, the record shows the officers found Lillo nude and defecating in public; had observed him wandering through traffic on two separate occasions, earlier the same day; knew Lillo previously had been involuntarily committed; and had been told by Lillo that he was out of his psychiatric medication.  From these facts an officer reasonably could conclude that Lillo was mentally ill, unable to determine for himself whether an examination was necessary, and likely to suffer from neglect.[24]  *See Garczynski*, 573 F.3d at 1167. Thus, at a minimum, the officers had arguable probable cause to believe Lillo met the criteria for involuntary examination.[25]  *See id.*  Plaintiff argues the officers were not permitted to consider Lillo's past involuntary examination and his actions earlier the same day in determining whether he should be involuntarily committed for an examination, because the Baker Act's "neglect" prong requires that the person be presently mentally ill, and facing a present threat of substantial harm.  *See* Fla. Stat. ch. 394.463(1)(b)(2). Again, had the officers violated the Baker Act, a finding the court does not make, such violation would not amount to a Fourth Amendment violation.[26]  Also, as noted, the officers at least had arguable probable cause to believe Lillo met the criteria of the Baker Act based on the facts they were confronted with on January 21.  Thus, the officers are entitled to qualified immunity on plaintiff's unlawful seizure claims.

---

[24]  Plaintiff argues Lillo agreed to go along with the officers for a voluntary examination.  While Lillo agreed to go to Bridgeway to get psychiatric medication, nothing in the record suggests he agreed to be examined there, and the officers reasonably could have decided an involuntary examination was appropriate.

[25]  Because the officers had arguable probable cause to take Lillo into custody based on neglect, rather than Lillo's danger to third parties, the question of whether Lillo was violent or suicidal is not material.

[26]  The court notes that plaintiff provides no authority for the suggestion that an officer may not consider past circumstances when considering whether someone is presently at risk.

Case No: 3:06cv247/MCR/EMT

Excessive Force

Plaintiff claims the force used by the officers to restrain Lillo while at Bridgeway was excessive and resulted in Lillo's death in violation of the Fourth Amendment.[27]  The Supreme Court has instructed that all claims of the use of excessive force by law enforcement officers in the course of an arrest are properly analyzed under the Fourth Amendment and its reasonableness standard.  *See Jackson v. Sauls*, 206 F.3d 1156, 1167 (11th Cir. 2000) (quoting *Graham v. Connor*, 490 U.S. 386, 395 (1989)). The court's inquiry in an excessive force case must focus on whether the officer's actions were "objectively reasonable" in light of the facts and circumstances confronting him; thus his conduct must be judged from "the perspective of a reasonable officer on the scene, rather than through the lens of hindsight [ ], taking into account all of the attendant circumstances."  *See Kesinger v. Herrington*, 381 F.3d 1243, 1248 (11th Cir. 2004) (citing *Graham*); *Vinyard v. Wilson*, 311 F.3d 1340, 1347 (11th Cir. 2002). In examining the officer's conduct, the court should look to the "totality of circumstances" to determine if the manner of arrest was reasonable. *See Draper v. Reynolds*, 369 F.3d 1270, 1277 (11th Cir. 2004) (citing *Tennessee v. Garner*, 471 U.S. 1, 8-9, 105 S. Ct. 1694, 1700, 85 L. Ed. 2d 1 (1985)). To assess whether the force used was reasonable, "courts must examine (1) the need for the application of force, (2) the relationship between the need and amount of force used, and (3) the extent of the injury inflicted." *Id.* at 1277-78 (citations and footnote modified); *see*

---

[27] In addition to the Fourth Amendment, plaintiff asserts, without explanation, that the officers violated his Eighth and Fourteenth Amendment rights.  The Eighth Amendment, however, applies to excessive force claims by post-conviction prisoners. *See Graham v. Connor*, 490 U.S. 386, 395 n. 10, 109 S. Ct. 1865, 1871 n. 10, 104 L.Ed.2d 443 (1988) ("After conviction, the Eighth Amendment 'serves as the primary source of substantive protection . . . in cases . . . where the deliberate use of force is challenged as excessive and unjustified.'") (citing Whitley v. Albers, 475 U.S. 312, 327, 106 S. Ct. 1078, 1088, 89 L. Ed.2d 251 (1986)). If an excessive force claim arises out of events occurring during an arrest, the Fourth Amendment governs. *See Garrett v. Athens-Clarke County, Ga.*, 378 F.3d 1274, 1279 n.11 (11th Cir. 2004). On the other hand, claims by a post-arraignment, pre-conviction pretrial detainee are properly analyzed under the Fourteenth Amendment substantive due process standard. *See, e.g., County of Sacramento v. Lewis*, 523 U.S. 833, 118 S.Ct. at 1714-15 (substantive due process analysis is the applicable standard where a constitutional claim relating to physically abusive government conduct does not arise under either the Fourth or Eighth Amendments); *Graham v. Connor*, 490 U.S. at 395 n.10, 109 S. Ct. at 1871 n. 10 ("It is clear, however, that the Due Process Clause protects a pretrial detainee from the use of excessive force that amounts to punishment").  Because the events in this case occurred during a seizure, the Fourth, rather than the Eighth or Fourteenth Amendment applies.

Case No: 3:06cv247/MCR/EMT

*also Hadley v. Gutierrez*, 526 F.3d 1324, 1329 (11th Cir. 2008); *Vinyard*, 311 F.3d at 1347. The need for the application of force is assessed by whether the force used was reasonably proportionate to the need for that force, which is measured by considering the severity of the crime, whether the suspect posed an immediate danger to the officer or others, and whether the suspect was actively resisting arrest or attempting to evade arrest by flight. *See Durruthy v. Pastor*, 351 F.3d 1080, 1094 (11th Cir. 2003) (quoting *Graham*), as cited in *Lee v. Ferraro*, 284 F.3d 1188, 1197-98 (11th Cir. 2002)); *see also Draper*, 369 F.3d at 1277, n. 13 (citing *Lee*). It is also well-settled that the right to make an arrest "necessarily carries with it the right to use some degree of physical coercion or threat thereof to effect it." *Graham*, 490 U.S. at 396; *Durruthy*, 351 F.3d at 1094; *Vinyard*, 311 F.3d at 1347; *Lee*, 284 F.3d at 1197.  Moreover, "[t]he calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments-in circumstances that are tense, uncertain, and rapidly evolving-about the amount of force that is necessary in a particular situation." *Graham*, 490 U.S. at 396-97; *see also Crosby v. Monroe County*, 394 F.3d 1328, 1333 (11th Cir. 2004) (noting that courts must not "view the matter as judges from the comfort and safety of our chambers ... [but rather] must see the situation through the eyes of the officer on the scene who is hampered by incomplete information and forced to make a split-second decision between action and inaction...").

In this case, the undisputed record evidence reflects that while at Bridgeway Lillo was physically aggressive and combative.[28]  In the Bridgeway parking lot, Lillo shattered the back window of a police car.  Once inside, Lillo struggled, damaged his restraints, and thrashed about, which resulted in him injuring himself at one point.  Plaintiff portrays Lillo as docile and cooperative, and argues there was no need to apply any force at all.  The record, however, shows Lillo to be far from docile at the time he was fettered.

Plaintiff argues further that, even if some force was necessary, the officers unreasonably applied deadly force to Lillo by pinning his face to the floor and beating him

---

[28]  Notably, Lillo had been without his prescribed psychiatric medication for some time.

while he was restrained. Nothing in the record, however, suggests the officers kept Lillo face down or struck him even a single time. Although Lillo had injuries to his scalp, face and head, the uncontradicted deposition testimony, supported by the Bridgeway records, is that Lillo inflicted the injuries to himself by thrashing against the floor and door fixtures.[29] Although the officers fettered Lillo and pinned him to the ground, on his side, they did so only because he continued to resist.

The instant facts are analogous to those in several prior cases in which the courts concluded that the force used was not excessive. In *Garrett v. Athens-Clarke County, Ga.*, 378 F.3d 1274 (11th Cir. 2004), the court found no excessive force where an arrestee died of positional asphyxia due to being fettered. *Id.* at 1280. The court noted that police initially restrained the arrestee solely with handcuffs, then resorted to greater restraint when the arrestee kicked, resisted, and attempted to escape. *Id.* Officers sprayed the arrestee with pepper spray, then immediately fettered him. *Id.* at 1281 ("[Officers] restrained [arrestee] in such a way that he could not harm another officer or himself should he decide to stop being compliant, a realistic possibility given his recent words and deeds"). The court rejected plaintiff's argument that death or serious injury was a likely consequence of fettering, and noted that even reasonable uses of force pose some risk of death. *Id.* at 1280 n.12; *see also Cottrell v. Caldwell*, 85 F.3d 1480, 1488, 1492 (11th Cir. 1996) (no excessive force, even though arrestee died of positional asphyxia due to being transported in restraints, upside-down, in a police car). Similarly, in *Fernandez v. Cooper City*, 207 F. Supp. 2d 1371 (S.D. Fla. 2002), the court found that police officers had not used excessive force in arresting a large, obese, mentally-ill and combative man who died of positional asphyxia due to prone restraint. *Id.* at 1378-80. The court noted that none of the officers ever punched, kicked or struck the arrestee with any objects, and never drew a weapon during the incident. *Id.* at 1375. In addition to wrestling the arrestee to the ground, and pinning him on his stomach with an officer's knee pressed into his back, officers also sprayed pepper spray into his face. *Id.* at 1378. The court determined that

---

[29] Bridgeway records also indicate that Lillo injured his face by pushing it against the floor.

the arrestee's death was caused not by excessive force but by his "illegal, physical and prolonged resistance." *Id.* at 1379-80. These cases reflect the general lesson of *Graham*, which cautions against applying hindsight to tense, unpredictable situations, and reminds courts that in deciding whether the force used was excessive, "[t]he only perspective that counts is that of a reasonable officer on the scene at the time the events unfolded." *See Garczynski*, 573 F.3d at 1166 (citing *Graham*, 490 U.S. at 396). That lesson is particularly relevant here. Application of *Graham* to the facts of this case leads to the inescapable conclusion that these officers did not violate Lillo's Fourth Amendment rights.

Having determined that the officers did not violate Lillo's Fourth Amendment rights, the court need not determine whether the right allegedly violated was "clearly established" at the time of the violation. *See Case*, 555 F.3d at 1328. Nonetheless, the court notes that it is not clearly established in the Eleventh Circuit that an uncooperative arrestee has a right not to be hobbled and fettered. *See Lewis*, 561 F.3d at 1291. In *Lewis*, police officers detained a man who was under the influence of cocaine, wandering into traffic and grunting incoherently. *Id.* at 1290. After the man attempted to run, the officers took him to the ground, pinned and hobbled him. *Id.* When the man ignored repeated requests to calm down, the officers hogtied him as well. *Id.* The man then lost consciousness and died due to positional asphyxia. *Id.* Noting that the officers were confronted with "tense, uncertain and rapidly evolving" circumstances, *id.* at 1292 (citing *Graham*, 490 U.S. at 386), the court held that, even if the hobble may not have been entirely necessary, it was not clearly established, by case law or otherwise, that an "agitated and uncooperative man with only a tenuous grasp on reality" had a constitutional right not to be hogtied. *Id.* The same is true in this case, in which Lillo's continued resistance and self-inflicted injuries supported a need for increased restraint by the officers.

Deliberate Indifference to a Serious Medical Need[30]

    To prevail on a claim of deliberate indifference to a serious medical need,[31] a plaintiff must satisfy both an objective and a subjective inquiry. *Bozeman v. Orum*, 422 F.3d 1265, 1272 (11th Cir. 2005). First, the plaintiff must show an objectively serious medical need. *Id.* A serious medical need is one which, if left unattended, poses a substantial risk of serious harm. *Brown v. Johnson*, 387 F.3d 1344, 1351 (11th Cir. 2004). The need must have been diagnosed by a physician or be so obvious that a layperson could recognize the necessity of treatment. *Id.* Second, the plaintiff must show the defendant acted with deliberate indifference to the need. *Bozeman*, 422 F.3d at 1272. Deliberate indifference requires: (1) subjective knowledge of a risk of serious harm and (2) disregard of that risk (3) by conduct that is more than gross negligence. *Id.* Subjective knowledge of a risk of serious harm requires that the defendant be aware of facts from which an inference of risk could be drawn, and that the defendant actually draw that inference. *Id.* There is no liability for a defendant's failure to mitigate a substantial risk he should have perceived but did not. *Cottrell*, 85 F.3d at 1491.

    According to plaintiff, Lillo demonstrated a serious medical need because of the manner of his restraint.[32] Although Lillo was restrained with multiple sets of handcuffs and fettered, plaintiff offers no evidence that the restraints themselves posed a substantial risk of serious harm. *See Garrett*, 378 F.3d at 1279-80 & n.12 (11th Cir. 2004). Furthermore, nothing in the record supports plaintiff's allegation that Lillo was kept face-down, rather than on his side, or that he had trouble breathing. Rather, the record reflects that Lillo was

---

[30] Plaintiff names all officers, as well as firefighters Bullard and George, as defendants in this count.

[31] The Eleventh Circuit recognizes a cause of action for deliberate indifference to the medical needs of an arrestee. *See Andujar v. Rodriguez*, 486 F.3d 1199 (11th Cir. 2007).

[32] To the extent plaintiff argues that Lillo demonstrated a serious medical need because he had been diagnosed with bipolar disorder the court does not disagree. However, there is no evidence the officers were indifferent to Lillo's psychiatric needs. To the contrary, the record shows from the very beginning - when they found Lillo defecating in public - that the officers tried to get him appropriate psychiatric help. They promptly took him to the nearest intake center, where he received some medication, and were in the process of trying to get him admitted when he suffered a cardiac arrest.

consistently aware, alert, talkative and combative. Similarly, plaintiff offers no evidence that the addition of a sedative, prescribed by a physician and administered by a Bridgeway nurse, rendered Lillo's medical condition more serious; nor does plaintiff present evidence that the bruises and lacerations on Lillo's face, scalp and extremities increased any risk. In sum, the record contains no evidence that prior to the time Lillo suddenly stopped breathing at 1:30 a.m. any officer, was aware of, or disregarded, any risk to Lillo. To the contrary, at the point Lillo suddenly stopped breathing and changed color the officers allowed EMS to immediately render emergency care to Lillo and transport him to a hospital. Thus, the officers are entitled to qualified immunity on plaintiff's deliberate indifference claim.

Failure to Intervene

Plaintiff claims certain officers, who held supervisory roles in the police department, failed to intervene when other officers unlawfully seized and applied excessive force to Lillo.[33] Although a supervisor may be liable under § 1983 when the supervisor knew the supervisor's subordinates would act unlawfully yet failed to intervene, *see Cottone v. Jenne*, 326 F.3d 1352, 1360 (11th Cir. 2003), here, the claim of supervisor liability fails because no officer acted unlawfully. Thus, the officers are entitled to qualified immunity on plaintiff's failure to intervene claim.

Bullard and George

As a final matter, the court notes plaintiff's medical expert opined that the primary cause of Lillo's asphyxiation was the pressure Bullard applied to Lillo's neck. The record reflects that, at the time, Lillo was thrashing about and striking his own head against the floor. It appears Chief Bullard, who was a firefighter and paramedic, not a police officer, attempted to secure Lillo's neck to prevent him from harming himself, rather than as an exercise of police authority. George, who was a firefighter and emergency medical technician, assisted Bullard by securing Lillo's legs. In any event, given Lillo's combative actions, the court finds it was necessary to apply some force to control Lillo. Based on the

---

[33] Plaintiff names Brown, Broxson, Bruhn, Harran, Holt and Rossi as defendants in this count.

Case No: 3:06cv247/MCR/EMT

court's findings of fact and the relevant law, it appears Bullard and George are also entitled to summary judgment on grounds of qualified immunity. The court hereby raises the issue of Bullard and George's qualified immunity *sua sponte* and will allow plaintiff time to file a response.

**Conclusion**

There is no evidentiary support for plaintiff's suggestion that the officers (and presumably Chief Bullard and George) were motivated by maliciousness or a desire to punish Lillo at any point during the hour and a half the officers had Lillo in custody.[34] Instead, the undisputed evidence shows that the officers were concerned for Lillo's well-being, their own safety, and the safety of third parties. The court's task is not to consider, in hindsight, what the officers could have or should have done differently. *See Graham*, 490 U.S. at 396-97. Because the undisputed record evidence shows that the officers in this case did not violate Lillo's constitutional rights, they are entitled to qualified immunity.

Accordingly, it is ORDERED:

1. The officers' motions for summary judgment are GRANTED.[35]

2. Plaintiff has until September 23, 2009, to respond and show a genuine issue of material fact for trial on his claims against Bullard and George.

**DONE and ORDERED** this 9th day of September, 2009.

s/ *M. Casey Rodgers*

**M. CASEY RODGERS**
**UNITED STATES DISTRICT JUDGE**

---

[34] Lillo was arrested shortly before midnight, arrived at Bridgeway's parking lot at 12:05 a.m., entered Bridgeway interior at 12:30 a.m., and went into cardiac arrest in the lobby at 1:30 a.m.

[35] Richard S. Brown, William P. Broxson, Darrell A. Bruhn, Howard R. Harran, Matthew M. Holt, Tom Matz, Robert D. Millard, Edmund K. Rossi and Donne G. Yeakos' Motions for Summary Judgment. (docs. 154-62).

Case No: 3:06cv247/MCR/EMT